IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PATRICIA B. DRENNAN,
        Plaintiff,

v.                                 Civil Action No. 2:04CV83
                                      (Maxwell)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for

Summary Judgment, Defendant's Motion for Summary Judgment, and Plaintiff's Motion for

Remand and has been referred to the undersigned United States Magistrate Judge for submission of

proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P.

72(b).

### I. Procedural History

Patricia B. Drennan ("Plaintiff") filed her application for SSI on January 17, 2002 (protective

filing date), alleging disability beginning January 16, 2000, due to high blood pressure, deep vein

blood clot, depression, suicidal, deteriorated disk in lower back, sleep apnea, and carpal tunnel

syndrome (R. 65, 76). The application was denied initially and on reconsideration (R. 47, 48).

Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Barbara Gibbs held on April

3, 2003 (R. 390). Plaintiff, represented by counsel, testified on her own behalf, along with

Vocational Expert Tim Mahler ("VE"). By decision dated May 18, 2003, the ALJ denied benefits

(R. 33). The Appeals Council denied Plaintiff's request for review on September 9, 2004, rendering the ALJ's decision the final decision of the Commissioner (R. 9).

## II. Statement of Facts

Plaintiff was born on December 24, 1950, and was 52 years old at the time of the administrative hearing (R. 38). She completed the eighth grade and obtained her GED (R. 454). In March 2003, approximately one week prior to the hearing, Plaintiff's supervisor wrote a letter stating that Plaintiff was working in the Sheltered Workshop of Nicholas County, performing light cleaning approximately 25 hours per week (R. 74). She was allowed to take breaks as necessary and, if required to lift heavy objects weighing more than ten pounds, could receive assistance from other workers. Plaintiff earned approximately $587.00 in gross earnings in January 2003 (R. 73). Plaintiff also worked as a cook between 1995 and 1997, and again in January 2002 (R. 77). There are, however, other references to employment in the record, such as a report of Plaintiff's working in 2001 cleaning houses (R. 171). The ALJ found that Plaintiff had not performed substantial gainful activity since her alleged onset date.

In 1992, Plaintiff was diagnosed with deep vein thrombosis ("DVT") of the left calf (R. 123). Throughout 1992 and 1993, she was treated for phlebitis.

Plaintiff underwent a total hysterectomy in 1992 (R. 320).

In August 1994, Plaintiff presented to the hospital clinic for complaints of some vertigo and some intermittent headache (R. 215). Her blood pressure was 152/110 on the first check, and 140/102 on the second. She was diagnosed with essential hypertension and prescribed Altace.

Two weeks later, Plaintiff's blood pressure was much improved (R. 213). She was tolerating her medication well without any problems. Her blood pressure was 120/80.

On November 29, 1994, Plaintiff had lost 16 pounds, but still had hypertension (R. 212). She reported occasional diastolics greater than 100, which appeared to be associated with periods of anxiety.

From about 1995 through 1998, Plaintiff was treated for fatigue, probable depression, hypertension, hyperlipidemia, history of DVT, dizzy spells, and obesity (R. 132-138). She was prescribed Prozac which she reported helped both the depression and the dizzy spells.

On January 27, 1999, Plaintiff presented to Dr. Cynthia Osborne for a follow up and refills of her prescriptions (R. 211). She stated she was "doing quite well." Her blood pressure was 110/80. Her examination was unremarkable. She was diagnosed with depression and hypertension and continued on Prozac and Altace.

On April 27, 1999, Plaintiff presented to Dr. Osborne for complaints of weakness in her legs, especially the left (R. 210). She also reported leg cramps. She was diagnosed with leg pain and prescribed Flexeril for nighttime and Rovaxin for daytime.

Two weeks later, Plaintiff reported persistent low back pain without radiculopathy (R. 209). She was diagnosed with persistent back pain and given an injection. X-rays of the lumbar spine revealed mild degenerative changes of the posterior joint and narrowing of the L5-S1 interspace, with no other abnormalities.

On January 12, 2000, Plaintiff presented to Dr. Osborne for complaints of fatigue, increased sleep with snoring, and sleepiness in the daytime (R. 203). She was diagnosed with sleep apnea and hypertension and referred to Dr. Ahmed Husari.

On January 18, 2000, Plaintiff underwent an evaluation for recurrent insomnia and excessive daytime somnolence/sleepiness, performed by Dr. Husari (R. 130). She underwent a sleep study in

February 2000, which showed evidence of severe obstructive sleep apnea (R. 129).

A second sleep study with a nasal CPAP machine showed good response to the machine. The apneas and hypopneas noted in the previous sleep study were almost completely eliminated. She was prescribed a nasal CPAP machine for her own use by Dr. Husari.

On April 25, 2000, Plaintiff reported to Dr. Husari that she was doing very well on the nasal CPAP machine (R. 127). She was using the machine on a regular basis and seemed to be tolerating it very well. She reported being more alert and awake.

On March 22, 2001, Plaintiff presented to Dr. Osborne for complaints of back pain for two weeks (R. 199). She was diagnosed with back pain, degenerative disc disease, and arthritis.

In June 2001, Plaintiff's adult son committed suicide by overdosing on OxyContin (R. 170).

On October 29, 2001, Plaintiff presented to Dr. Osborne for a check-up (R. 194). They discussed Plaintiff's son's death. Plaintiff reported "doing pretty well." Dr. Osborne opined, "all considered, doing ok." She diagnosed Hypertension and Grief.

In November 2001, Plaintiff's husband of 27 years left her.

Plaintiff attempted suicide on November 8, 2001, with a multiple drug overdose (prescription medications) (R. 156). She was admitted to the hospital (R. 169). Upon admission, Plaintiff was diagnosed with Major Depressive Episode, single, nonpsychotic with a GAF of 30 (R. 172). Upon physical examination, Plaintiff's extremities had superficial variscosities but no significant edema (R. 176).

Plaintiff was examined again while still in the hospital, on November 11, 2001 (R. 174). She was diagnosed with Major Depression, recurrent, without psychotic features and rule out Bipolar II disorder. Her GAF was listed as 25.

Plaintiff was discharged from the hospital on November 12, 2001 (R. 169).

Plaintiff applied for SSI in January 2002.

On her Adult Disability Report dated January 28, 2002, Plaintiff stated her only doctor was Cynthia Osborne, who treated her for back and leg pain, depression, and high blood pressure (R. 79).

Plaintiff's daily activities were listed as doing laundry, vacuuming a little at a time, dusting furniture, paying bills, mopping floors, managing her bank account, and mending clothes (R. 95). Her adult disabled son helped her mop, sweep, and take out trash whenever she needed him. She shopped for food, clothing and medication, but was limited to about 45 minutes at a time due to pain (R. 96). She could drive. She visited with relatives for about an hour and a half, a couple times a week.

On March 12, 2002, Plaintiff presented to Dr. Osborne for complaints of a rash on her face and back of neck (R. 193). She had not used any new soaps, etc. She was diagnosed with anxiety and urticaria and prescribed Depo-Medrol, Benadryl, and cool soaks as needed.

On March 13, 2002, Plaintiff presented to Dr. Osborne for complaints of "nerves" (R. 192). It was noted she was continuing through the grief process. She was not sleeping, was drinking Vodka daily, and continued to "feel awful." She had suicidal thoughts with no plan, and had stopped her blood pressure medication. Her blood pressure was 134/100. Dr. Osborne noted poor judgment and insight and also noted Plaintiff had an appointment to see a therapist that month. She diagnosed Depression– major and Hypertension. Dr. Osborne had a long discussion with Plaintiff, who promised she had no suicidal intent and promised to seek help if she did. Dr. Osborne also encouraged her to take Klonopin.

On March 13, 2002, Plaintiff underwent a psychological evaluation for the State disability

determination service, performed by Julie Jacobs, M.A. (R. 178). Plaintiff told Ms. Jacobs she was taking Propox and alprazolam, as well as over-the-counter Tylenol. She drank three to four days per week, drinking to get drunk every time. Upon Mental Status Examination, Plaintiff's dress, hygiene and grooming were casual, neat, and clean (R. 181). Her gait was slow with a limp. She was polite, cooperative, and subdued. Her interactions were fair. She maintained poor eye contact. Length and depth of responses were good. She displayed no sense of humor but was able to carry on a conversation. Overall, she was introverted. Her speech was relevant, coherent, and normally paced. She was fully oriented. Her mood was depressed and she was labile and tearful throughout the assessment. Her thought processes were normal. She reported preoccupation with her disabled son, fearing finding him dead. She also feared being left alone and extreme grief over the loss of her husband who had left her. She denied hallucinations and delusions. She reported blackout spells when she did not remember what she was doing. She tended to physically hurt herself during these spells, which she said were not associated with drinking, but with emotional pain. Her insight was fair, judgment was poor. She reported suicidal thoughts with an attempt in that past November, and was believed to pose a moderate risk for suicide.

Plaintiff's immediate and recent memory were within normal limits, while her remote memory was moderately deficient (R. 182). Her concentration was average and there was no unusually psychomotor activity noted. Her IQ was verbal–80, performance–79, and full scale–78 (R. 182). The results were considered valid. She read at the high school level, spelled at the 5th grade level, and did math at the 6th grade level. These results were also considered valid.

Plaintiff reported her daily activities as getting up between 7:30 and 8:00 a.m., taking a shower, and getting dressed (R. 184). She checked on her son who lived in a trailer behind her house. She spent her day doing light housework and dishes. She ate a sandwich in the afternoon and

often took a nap. She the puttered around her house or sat in her chair and cried. She ate supper with her son if he cooked, sometime between 3:00 and 7:00 p.m. She sat around afterward until going to bed around 11:00 p.m. She took care of her own hygiene, occasionally cooked, and occasionally cleaned. She washed dishes once a week. She did laundry. She went grocery shopping with her son's help. She drove and ran errands.

Plaintiff's interactions with the staff were fair. She did not attend church or belong to any organizations. She rarely ate in restaurants and did not visit friends, although she kept in though with family. Social functioning was considered moderately deficient, concentration was mildly deficient, persistence was mildly deficient, and pace was moderately slow.

Ms. Jacobs diagnosed Plaintiff with Alcohol Dependence; Major Depressive Disorder, moderate, recurrent; Pain Disorder related to psychological factors and general medical condition; and Borderline Personality Features. Her prognosis was deemed "poor." She would be capable of handling her own financial affairs, however.

State agency reviewing psychologist Frank D. Roman, Ed.D., completed a Mental Residual Functional Capacity Assessment ("RFC") on March 15, 2002, opining Plaintiff would be moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (R. 186). She would otherwise be either not limited or not significantly limited. She was not markedly limited in any area.

Dr. Roman opined Plaintiff's activities of daily living were restricted "mainly due to blood clot in her leg, LBP (low back pain) + carpal tunnel" (R. 188). Based on the mental evaluation, Plaintiff could perform routine activities of daily living and follow one and two-step instructions in

a low-stress setting (R. 188).

Dr. Roman also completed a Psychiatric Review Technique form ("PRT"), based on an affective disorder (depression) and substance addiction disorder (R. 290). He found Plaintiff would have moderate difficulties in maintaining social functioning and concentration, persistence or pace, mild restriction of daily activities; and had had one or two episodes of decompensation, each of extended duration (R. 300). Dr. Roman opined Plaintiff was able to perform routine chores.

On March 15, 2002, Plaintiff presented to Dr. Osborne for a check up (R. 191). She felt about the same. She was still tearful. She was tolerating the Klonopin "ok." Although she was not much better, she did "do a little work" the day before. Her blood pressure was 108/74. She had an appointment with a therapist in four days. Dr. Osborne diagnosed Major Depression and Anxiety and increased her Klonopin.

Plaintiff began counseling at Seneca Mental Health in March 2002.

On March 20, 2002, Plaintiff presented to Dr. Osborne for a follow-up (R. 190). She had seen her therapist. It "went ok." She was feeling better, sleeping better, and her mood was better. She had an appointment to see a psychologist, Dr. Urick. Her blood pressure was 110/76. Dr. Osborne diagnosed Major Depression, Unresolved Grief, and Anxiety, and continued her medications.

On April 18, 2002, Plaintiff underwent a physical at the request of the State agency, performed by Arturio Sabio, M.D. (R. 268). Plaintiff's chief complaints were low back pain, deep vein thrombosis of the left leg with persistent left leg pain, and hypertension. Plaintiff stated she had had back pain since childhood. She said a CT scan of the lumbar spins showed degenerative disc disease. She complained of constant aching which sometimes became sharp, stabbing pain with

8

activity. There was no radiation of pain to the arms or legs. She also reported sometimes falling down unexpectedly. She had no numbness or tingling of extremities. She had increased pain with repetitive bending and stooping, sitting for two hours or riding in a car for two hours. She had had no operation, epidural injections or physical therapy for her back pain. She also stated that she had DVT of the left leg nine years earlier. She was treated for eight months with Coumadin, and advised to avoid prolonged standing. Her legs improved with the Coumadin, but she still complained of swelling and pain in her legs "after walking eight hours on a job." After walking one hour she had to stop and rest her legs. She also had a history of hypertension with medication. She had sleep apnea for which she was provided a CPAP machine. She had been using the machine for five years. She drank beer and sometimes vodka two or three times a week. Her treating physician was Dr. Osborne. She was taking Klonopin, Xanax, Darvocet, and Enalapril.

Upon examination, Plaintiff was 5'4" tall and weighed 194 pounds (R. 269). Her blood pressure was 120/80. Eyesight was 20/25 in both eyes, with corrective lenses. Her neck, cardiovascular, chest, abdomen, and spine were normal. There was no sign of active inflammation in any joint. There was no edema or cyanosis or ulcers and all pulses were normal. She had tenderness in the right wrist with positive Tinel's sign, but with no swelling, redness or effusion.

Plaintiff's neurological examination was normal. Handgrips were 6kg on the right and 15 kg on the left. Deep tendon reflexes were normal. Babinski reflex was negative. Plaintiff could walk on her heels, toes, and heel-to-toe in tandem. She could stand on either leg separately and could squat fully. Fine manipulation was normal. She could write, pick up coins, and button buttons without assistance. Her gait was normal and she did not require any ambulatory aids. She had no tenderness of the spine. Spine curvature was normal. She had no muscle atrophy or weakness.

9

There were no sensory deficits in the upper or lower extremities. There was slight swelling of the left leg and thigh as compared to the right. There was no calf muscle tenderness. Homan's sign was negative in both legs. She had no cyanosis or edema. There were some varicose veins which were nontender. She had venous insufficiency on the left side. The rest of her vital signs were normal She had carpal tunnel syndrome of the right hand, with numbness that "comes and goes." There was no evidence of numbness or muscle atrophy during the examination, however. Straight leg raising was negative to 90 degrees bilaterally both sitting and supine. Flexion was 90 degrees forward and 25 degrees laterally to either side. X-ray of the lumbar spine showed moderate degenerative changes involving the L5-S1 level, with less throughout the lumbar spine.

On April 25, 2002, Plaintiff presented to William R. Carson, M.D., for her carpal tunnel syndrome (R. 274). She reported carpal tunnel syndrome for eight years, and had been wearing splints for years at night and using anti-inflammatory medication. She continued to awaken at night due to paresthesia in the median nerve distribution. She attributed her symptoms to using a chop saw and doing repetitive motion.

Plaintiff reported taking blood pressure medication, aspirin, and two types of "nerve medicines." She drank alcohol once or twice a week.

Examination of the right arm revealed no gross deformity (R. 274). Tinel's test was "intermittently positive" with percussion. Phalen's test was positive. There was no pain in the forearm with pronation or supination against resistance. The diagnosis was bilateral carpal tunnel, right more severe than left. Her blood pressure was 116/88.

Plaintiff underwent right carpal tunnel surgery on May 3, 2002 (R. 276).

On May 7, 2002, State agency reviewing physician Fulvio Franyutti, M.D. completed a

Physical Residual Functional Capacity Assessment ("RFC"), based on Plaintiff's lower back pain syndrome, DDD of the lumbar spine, DVT and venous insufficiency by history, and right carpal tunnel syndrome with mild weak handgrip (R. 277). Dr. Franyutti opined Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and sit and stand/walk about six hours each in an eight-hour workday (R. 178). She would have no postural, manipulative, visual or communicative limitations. She should avoid concentrated exposure to extreme cold and heat. Dr. Franyutti found Plaintiff's RFC should be reduced to medium due to pain, weakness, and fatigue (R. 282).

Plaintiff followed up with Dr. Carson on May 16, 2002, for her left carpal tunnel syndrome (R. 285). She had had a good result from her right carpal tunnel surgery. She had no complaints. She reported drinking alcohol once or twice a week. She was diagnosed with left carpal tunnel syndrome and scheduled for surgery.

Plaintiff underwent left carpal tunnel surgery on May 31, 2002 (R. 287).

On her Reconsideration Disability Report dated June 11, 2002, Plaintiff reported her illnesses and injuries were still the same since she filed her claim (R. 108). She had undergone carpal tunnel surgery on her right and left hands, performed by Dr. Carson (R. 109). She reported there were no changes in her daily activities since her claim was filed.

On June 18, 2002, Dr. Carson wrote that Plaintiff was status post left carpal tunnel release (R. 288). She had no complaints. She could gradually resume activities in about two weeks.

On July 18, 2002, State agency reviewing psychologist James Capage, Ph.D. affirmed the mental RFC and PRT by Dr. Roman (R. 187, 290).

On August 1, 2002, Plaintiff underwent a physical examination for the State agency,

performed by Registered Nurse Debbie Blake at the clinic (R. 340-341). Plaintiff's statement of disability was: "I cannot work because [of] persistent L leg pain, major depression; chronic back pain." Upon examination, Plaintiff's blood pressure was 132/74. Her posture and gait were normal. There were varicose veins noted bilaterally to palpation. She had low back tenderness with positive leg lifts, right more than left. Her left leg was tender to palpation, and variscosities of veins were noted. Plaintiff was tearful and her mood and affect were flat.

Plaintiff described constant lower left leg pain and intermittent low back pain radiating into her left leg (R. 341). The diagnosis was depression-severe, musculoskeletal back pain with sciatica, and history of DVT in the lower left leg. Ms. Blake opined that Plaintiff could not work "mentally," and her back pain needed evaluation. She could not perform full time work "at this time" due to "poor mental status." Otherwise Plaintiff could perform light exertional work. Increased stress and prolonged sitting, standing, etc. should be avoided. Her disability was expected to last one year.

On August 14, 2002, State agency reviewing physician Hugh M. Brown, M.D., completed an RFC based on Plaintiff's osteoarthritis of the lumbar spine, carpal tunnel syndrome status post carpal tunnel release, and history of DVT (R. 304). He opined Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, and could stand/walk and sit about six hours each in an eight hour workday (R. 305). She had no postural, manipulative, visual, environmental or communicative limitations. He reduced Plaintiff's RFC to medium based on the degree of subjective pain and objective findings.

On August 28, 2002, Plaintiff presented for the first time to psychiatrist Lois A. Urick, M.D. for her long history of depression and anxiety (R. 342). Plaintiff reported a 20-year history of depression and anxiety. Symptoms increased significantly following the death of her son in June

2001. Her husband also left her in November 2001, for a younger woman. She attempted suicide by taking an overdose of pills, and was hospitalized. She denied any suicidal ideation currently, "noting that she has another son who requires a lot of care (due to seizures and "being slow") and she has to be here to take care of him." He lived in a trailer behind her house "and she spends a great deal of time caring for him, as he requires a fair amount of supervision in the home and help with such things as shopping, housecleaning and ADLs ("activities of daily living")." Plaintiff said the son was hard to handle.

Plaintiff had been taking Prozac but stopped several months earlier due to an inability to afford it (R. 342). She felt it was helpful with mood swings, but not much with depression. She denied any history of alcohol abuse, although she reported she used alcohol to feel better for a time after her son's death.

Mental Status Examination showed Plaintiff was fully oriented, exhibited good dress/grooming/hygiene, had good eye contact, and no psychomotor abnormality (R. 343). Her manner was appropriate and her affect mildly depressed and tearful at times. She reported her mood as "not all that great." Her speech was normal in rate, tone, and content and her thoughts were goal-directed with no evidence of delusion. Her attention, concentration and impulse control were intact and sensorium was clear. Her cognition appeared intact and intelligence was estimated as average. Recent and remote memory appeared intact to clinical observation. Insight was fair to good, and judgment was good.

Dr. Urick diagnosed Major Depressive Disorder, recurrent, severe, without psychotic features; Anxiety Disorder NOS; Bereavement; rule out Alcohol Abuse; and rule out Personality Disorder NOS. Her GAF was 50 and her prognosis was good (R. 343). Dr. Urick noted Plaintiff's

good past response to Prozac and re-started her on that medication, encouraging her to participate in psychotherapy.

On September 25, 2002, Plaintiff presented to Dr. Osborne for a check up (R. 347). Plaintiff reported her depression was better since she had seen Dr. Urick. The psychiatrist had started her on Prozac and Valium, but she was not taking the Valium, only using Xanax. Plaintiff's blood pressure was 140/90. Dr. Osborne diagnosed depression, hypertension, and hyperlipidemia.

On October 30, 2002, the State DHHR found Plaintiff's impairments met or equaled a listing and found her disabled (R. 359).

On November 25, 2002, Plaintiff presented to Dr. Osborne for a regular check up (R. 346). Plaintiff stated that medically she was doing well with no complaints. She reported that three weeks earlier she took "quite a bit of Xanax" with alcohol. She recognized this as a suicide attempt and stopped taking the Xanax completely without any medical help. She had seen her psychiatrist and counselor since then. She was currently still drinking alcohol with some binges on weekends. She denied any suicidal ideation. She was very grateful to her sister and the rest of her supportive family. Her affect was anxious and her mood seemed slightly dysthymic. Her blood pressure was 132/82. Dr. Osborne diagnosed depression and hypertension and continued her on her same medications.

On her Request for Hearing dated November 2002, Plaintiff reported her lower back was hurting a lot worse (R. 118). She reported seeing Dr. Lois Urick two times a month and Terri Ward every two weeks for counseling and medication (R. 119). She was still seeing Dr. Osborne for her physical impairments. Dr. Osborne prescribed Darvocet for back and leg pain and Enalapril for high blood pressure, while Dr. Urick prescribed one Valium a day at night for depression and sleep, and Prozac for depression (R. 121). She had seen Dr. Urick on August 28th, September 27th, and

14

November 29th, 2002. She reported she still had numbness in her hands after the carpal tunnel surgery.

On December 2, 2002, Plaintiff underwent a psychological evaluation performed by William Hagerty, M.A. (R. 351). Plaintiff did not appear overly anxious about being evaluated. Rapport was quickly established. She was neatly dressed and groomed. She attempted all tasks. Her affect was constrained, but she was able to follow conversation and respond to questions. She reported "passing thought" of hurting herself three to four weeks prior. She was cooperative and her eye contact was within normal limits. She was fully oriented. Slosson Intelligence Test–Revised resulted in a quotient of 76, percentile 7. Bender Gestalt indicated no significant organizational and/or perceptual problems; "[h]owever, her designs do indicate a reluctance to interact with or mother or her mother's counterpart."

Mr. Hagerty concluded that Plaintiff appeared to be experiencing depressive symptoms which contributed to her symptoms of anxiety (R. 352). She felt depressed as the result of the loss of significant others over the past year. "Moreover, her physical limitations further compound her feelings of helplessness, and hopelessness." He diagnosed Major Depressive Disorder, severe w/o psychosis; Anxiety Disorder, NOS; and a GAF of 50.

A venous doppler on January 21, 2003, showed "no ultrasound evidence of deep vein thrombosis of the left leg" (R. 362).

Mr. Hagerty completed a Mental RFC on February 14, 2003, opining Plaintiff would have "marked" limitations in her ability to sustain attention and concentration for extended periods; maintain regular attendance and punctuality; complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an

unreasonable number and length of work breaks; interact appropriately with the public; respond appropriately to direction and criticism from supervisors; and set realistic goals and make plans independently of others. She would have moderate limitations in her ability to understand, remember and carry out detailed instructions; exercise judgment or make simple work-related decisions; work in coordination with others without being unduly distracted by them or unduly distracting them; maintain acceptable standards of grooming and hygiene; maintain acceptable standards of courtesy and behavior; demonstrate reliability, ask simple questions or request assistance from co-workers or supervisors; respond to changes in the work setting or work processes; be aware of normal hazards and take appropriate precautions; carry out an ordinary work routine without special supervision; and travel independently in unfamiliar places.[1]

Mr. Hagerty explained his findings as follows:

The client has poor concentration as indicated by a symptoms assessment completed on 1/22/03 . . . .

A symptoms assessment on 1/22/03 indicated significant reduction in energy, concentration and motivation . . . .

Symptom checklist indicates, to a significant degree, that the client feels hopeless and worthless which would reduce her effectiveness in public or social settings . . . .

Depressive symptoms would decrease her tolerance to change of routine . . . .

Symptoms of withdrawal, hopelessness, etc. would likely result in her using such independence to isolate herself . . . .

Depressive symptoms would limit the client's energy and motivation to do a good job. Symptoms surgery on 1/22/03 supports this.

Mr. Hagerty opined Plaintiff's impairments/ limitations would not have existed since January

---

[1] In this form, "marked" is defined as limited fro ½ to 1/3 of the workday; "moderate" as limited for 1/3 to ½ of the worday, and "slight" as limited less than 1/3 of the workday.

16, 2000, but would have existed since June 2001, the month her son died of an overdose (R. 357).

On February 26, 2003, Plaintiff's treating psychiatrist, Lois Ulrick, M.D., completed a Psychiatric Review Technique, opining Plaintiff had an affective disorder, but that it was not severe (R. 365). She explained that Plaintiff had Major Depressive Disorder, but that it was currently mild (R. 368). She had depressed mood, psychomotor agitation, and decreased energy that were mild and occurred only occasionally. Dr. Ulrick opined Plaintiff would have no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and had had one or two repeated episodes of decompensation, each of extended duration (R. 375). She found Plaintiff's ability to maintain employment was not significantly affected on the basis of mental illness (R. 377).

On February 28, 2003, Mr. Hagerty responded to a question from Plaintiff's counsel, stating that Plaintiff's results on the SIT-R were 76 (quotient) and 7(percentile). He opined this indicated Plaintiff was likely functioning within the borderline range of intellect.

On March 4, 2003, Plaintiff followed up with Dr. Osborne regarding her leg (R. 360). Her blood pressure was 120/88. Dr. Osborne noted Plaintiff seemed happy and cooperative. Plaintiff complained of worsening eyesight, varicose veins in the left lower leg with pain on palpation; and pain and decreased range of motion in the left shoulder "due to washing walls and windows at job." Dr. Osborne diagnosed left shoulder strain; varicose veins; depression; and obesity.

On March 26, 2003, a Ms. Kay Jordan wrote a letter stating that Plaintiff was employed through the Sheltered Workshop of Nicholas County as a custodian five hours a day, five days a week (R. 74). Ms. Jordan wrote that Plaintiff did an excellent job providing light cleaning services for the office. She was allowed to take breaks as necessary. She was not to lift over ten pounds at

a time. If the garbage was heavy, someone offered to help her carry it outside. Several employees offered emotional support to Plaintiff from time to time, which "seem[ed] to be of tremendous help to her." Ms. Jordan wrote that the office truly appreciated Plaintiff in the way she kept the office so neat and clean, and they also appreciated her kindness and willingness to help out whenever she could. She had been a real support to them, and they felt they had been a real support to her, especially in the way of emotional stability.

On April 2, 2003, Dr. Ulrick clarified her opinion for Plaintiff's counsel, stating Plaintiff' ability to maintain employment "at her current position" was not significantly affected on the basis of mental illness (R. 379). She opined that Plaintiff's current work setting was appropriate for her at the time based on her emotional condition.

At the Administrative Hearing held on April 3, 2003, Plaintiff testified she was working cleaning offices for the Sheltered Workshop from 2 in the afternoon until 7 in the evening (R. 397). She was allowed to take breaks as she needed them. She sat down quite frequently, about every 15 or 20 minutes. She did not do any heavy work.

Plaintiff testified her treating physician was Dr. Cynthia Osborne and her treating psychologist was Dr. Urick (R. 398). She also saw a counselor, Terry Webb. She was not seeing anyone else at the time. She saw Dr. Osborne every other month, and Dr. Urick about every three months. She was still treating with the same doctors. Plaintiff was currently taking Prozac -- 20 milligrams twice a day, and Valium -- 5 milligrams which she took if she had to, usually at night, but in the daytime if she got "real stressed. She had taken one the past Saturday, but had not taken any for a couple of weeks. She also took her blood pressure medication every day and Darvocet 1300 milligrams twice a day every day (R. 403). She testified the Darvocet made her "a little

sluggish," like she could lie down and take a nap, for about an hour or hour and a half.

Plaintiff testified she could take care of her own personal needs, except for tying her shoes when her back was really giving her trouble. Her son would then tie them for her. This happened "maybe a couple of times a month." Plaintiff also testified she had sleep apnea and had nightmares a lot (R. 405). She had a great deal of trouble sleeping. She believed she got about one or two good nights of sleep per week. The lack of sleep was not due to the apnea, but due to things on her mind. Once she fell asleep, she slept. She did not nap during the day.

Plaintiff testified she "piddled around" the house during the day, doing a load of laundry. Her son did the sweeping and mopping most of the time. She sometimes cooked and ran the vacuum cleaner part of the time. She swept the floor. She grocery shopped with her son's help. She cleaned the bathroom.

Plaintiff used to go to a bar in town to visit with a friend, but she had stopped a couple of weeks earlier. She had not had whiskey since Christmas, but had a few beers now and then, the last time being about three weeks earlier.

Plaintiff testified she needed to take breaks at work and sit down due to the blood clot in her leg (R. 434). At her job she used a ringer mop, a bucket on wheels, and a garden hose, as well as a lightweight vacuum.

Plaintiff testified her pain medication did not take away the pain, but did help. She took it every six to eight hours and the effect wore off in about four hours. Most of the time her pain was at a level of 5 out of 10. She still had numbness in her hands following the carpal tunnel surgery.

Plaintiff testified she was also borderline diabetic and had high blood pressure that stayed "pretty well under control" with medication (R. 443). Sometimes it went up if she was very stressed.

She also had a light headache, for which her doctors suggested Tylenol. When asked if she had any dizziness or lightheadedness, Plaintiff testified: "Well, if I get up too quick I have dizzy spells."

On April 27, 2003, Plaintiff treating physician Dr. Osborne completed an RFC form, stating Plaintiff had a history of chronic complaints of pain in the back with intermittent flares; history of shoulder pain; leg pain due to varicose veins; obesity; hypertension; depression; anxiety; and hyperlipidemia (R. 381). Her present diagnoses were chronic lumbar strain, mild degenerative disc disease of the lumbar spine, varicose veins, left shoulder strain, obesity, thrombophlebitis, depression, and anxiety. She noted there was no evidence of DVT.

Dr. Osborne opined Plaintiff would be capable of doing "light" or "sedentary" level work for an eight-hour day, based on her physical impairments alone (R. 382). She would not need to alternate position frequently or occasionally; would not need a sit/stand option; could sit for six hours at a time; could stand for one hour at a time; and could walk for one hour at a time. She would not need to recline or lie down during the day with her feet up, or have frequent rest periods sitting down during the day. She would be restricted to infrequent stooping/bending and squatting, and other posturals occasionally. She should avoid concentrated exposure to machinery, jarring or vibration, fumes, dust and environmental pollutants, and environmental hazards. She would be expected to experience mild to moderate chronic pain and intermittent severe pain. She did not need any assistive device to ambulate. She would not need to elevate her feet and could use her feet for repetitive movements such as pushing and pulling. She could use her hands for repetitive action in a job where repetition or prolonged use of hands was required. She opined that Plaintiff had 4/5 grip strength and no numbness of the hands. She could work at the sedentary to light exertional level full time on a sustained basis.

Dr. Osborne then stated that Plaintiff's depression and anxiety would contribute more to her inability to work. She opined that Plaintiff was not disabled by her physical impairments, but a "mental evaluation should be reviewed."

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6. The claimant has the residual functional capacity to perform light work with a sit/stand option at a low stress level (unskilled work with routine and repetitive processes involving things rather than people) that requires postural activities only occasionally and non-repetitively, that does not require exposure to hazards such as moving machinery and unprotected heights, and that allows the claimant to elevate one leg at a time to a height not to exceed 12 inches for 50 percent of the workday.

7. The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

8. The claimant is currently an "individual closely approaching advanced age." (20 CFR § 416.963).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR § 416.964).

10. The claimant has no transferable skills from any past relevant work and/or

transferability of skills is not an issue in this case (20 CFR §416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a desk attendant, with 55,000 positions nationally and 170 within the regional area; a packing and filling machine tender, with 150,000 positions nationally and 400 within the regional area; or a hand packer, with 200,000 positions nationally and 200 within the regional area. The vocational expert further testified that the above-cited jobs are consistent with the Dictionary of Occupational Titles (SSR 00-4p).

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR § 416.920(f)).

(R.32-33).

## IV. The Parties' Contentions

Plaintiff contends:

1. The ALJ failed to give consideration to the combined affects [sic] of the several impairments documented in the record. DeLoatche vs. Heckler, 715 F.2d 148 (4th Cir. 1983).

2. The ALJ failed to employ the requirements of SSR 96-7p when making determinations on the issues of subjective symptoms and credibility.

3. The ALJ relied upon an incomplete and inadequate hypothetical question posed to the VE and by limiting counsel's representation of her client, destroyed the non-adversarial nature of the proceeding. Coffman vs. Bowen, 829 F.2d 514 (4th Cir. 1987).

4. The ALJ disregarded the MRFC of William Hagerty and the DDS examiner in favor of the PRT of Dr. Urick.

5. The ALJ failed to consider a closed period from January 2002 through February of 2003.

6. New and material evidence requires remand

Defendant contends:

1.    The ALJ did not err in assessing the severity of the combination of Plaintiff's impairments.

2.    The ALJ appropriately considered Plaintiff's subjective complaints under the regulations.

3.    The ALJ did not err in his consideration of psychologist Hagerty's report.

4.    Plaintiff has worked with the same conditions now alleged to be disabling.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Combination of Impairments

Plaintiff first argues the ALJ failed to give consideration to the combined affects [sic] of the several impairments documented in the record. DeLoatche vs. Heckler, 715 F.2d 148 (4th Cir. 1983). Defendant contends the ALJ did not err in assessing the severity of Plaintiff's combination of impairments. The Fourth Circuit held that the Commissioner must consider the combined effect of a claimant's multiple impairments and cannot fragmentize them. Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989) ("It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity.")

Here the ALJ determined that Plaintiff had degenerative changes of the lumbar spine with pain; sleep apnea; a history of deep vein thrombosis; a history of bilateral carpal tunnel syndrome with release; and a major depressive disorder. She then found Plaintiff had a "combination of impairments," both physical and mental, that were "severe," because they resulted in significant limitations on Plaintiff's ability to perform basic work activities. The ALJ next determined that Plaintiff's impairments, even in combination, did not meet or equal the requirement of any Listed impairment. The ALJ's consideration of Plaintiff's RFC clearly takes into consideration her mental and physical limitations in combination as well as singly, as she restricted Plaintiff to light work with a sit/stand option that requires postural activities only occasionally and non-repetitively, requiring no exposure to hazards, and allowing her to elevate one leg at a time, taking into account her physical symptoms, while also requiring the work be low stress and unskilled with routine and repetitive processes involving things rather than people, thus taking into account her mental symptoms. The ALJ then included this combination of physical and mental restrictions in her

hypothetical to the VE. The VE responded that, despite these restrictions, there would be a significant number of jobs available to Plaintiff in the national and local economy.

The undersigned finds the ALJ did not fail to consider the combined effect of Plaintiff's impairments supported by the record.

## C. Subjective Symptoms and Credibility

Plaintiff next argues the ALJ failed to employ the requirements of SSR 96-7p when making determinations on the issues of subjective symptoms and credibility. Defendant contends the ALJ appropriately considered Plaintiff's subjective complaints under the regulations. The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

The ALJ here found Plaintiff was not entirely credible.  The ALJ here first found Plaintiff

met the threshold obligation.  She found Plaintiff had medically determinable impairments that could

reasonably be expected to cause some of the symptoms described.  The undersigned does not believe

Craig requires the ALJ to list every impairment alleged and determine if Plaintiff's symptoms from

that impairment are credible.  Craig requires only a finding that there is "a medical impairment"

which could reasonably be expected to produce the symptoms alleged by the claimant.

Having found Plaintiff met the threshold requirement, the ALJ evaluated the intensity and

persistence of Plaintiff's symptoms, and the extent to which they affected her ability to work.  The

ALJ considered Plaintiff's statements about her symptoms; her medical history, medical signs, and

laboratory findings; medical evidence of pain; Plaintiff's daily activities; specific descriptions of the

symptoms; and the medical treatment Plaintiff took to alleviate the symptoms.

Plaintiff's argument notwithstanding, a review of the decision shows the ALJ did credit

Plaintiff's allegations of swelling and leg pain, even to the point of requiring in her RFC and

hypothetical that the job permit Plaintiff to elevate her legs.  She clearly credited Plaintiff's

allegations of back pain and limited her to light exertional level work with a sit-stand option.  She

clearly credited Plaintiff's allegations of wrist pain and weakness and limited her to non-repetitive

motions and only occasional fine manipulation.[2]  The ALJ clearly credited Plaintiff's mental

symptoms, by limiting her to low stress, unskilled work with routine and repetitive processes

involving things rather than people.

The ALJ also expressly found Plaintiff had the severe impairment of sleep apnea.  The record

---

[2]The undersigned notes that the ALJ did not expressly include a limitation on fine
manipulation in her written decision.  She did, however, ask the VE a hypothetical with that
additional limitation and the jobs the ALJ cites in her decision are the jobs the VE named in
response to the hypothetical with this additional restriction on fine manipulation.

shows, however, that Plaintiff responded "very well" to the CPAP machine. She also tolerated the

machine "very well." She told the doctor she was awake and more alert during the day. Plaintiff

never returned to Dr. Husari despite his advice to return to him if she had any problems. Substantial

evidence therefore supports the ALJ's not finding any functional limitations due to Plaintiff's sleep

apnea/ hypopnea.

On the other hand, the ALJ found Plaintiff's hypertension a non-severe impairment, finding

it did not cause a significant limitation of Plaintiff's functioning. Substantial evidence supports the

ALJ's finding that Plaintiff's hypertension was well controlled when Plaintiff was taking her

medication. The record fails to document ongoing complaints of severe dizziness. In fact, at the

hearing, Plaintiff testified she got dizzy only when she "got up too quick."

In addition to addressing Plaintiff's specific impairments, the ALJ also considered Plaintiff's

daily activities in analyzing her credibility. Plaintiff shopped for groceries, mopped, vacuumed, did

laundry, paid bills, and cooked. In August 2002, Plaintiff reported that her disabled adult son

required a lot of care (due to seizures and "being slow") and she "ha[d] to be here to take care of

him." He lived in a trailer behind her house "and she spen[t] a great deal of time caring for him, as

he require[d] a fair amount of supervision in the home and help with such things as shopping,

housecleaning and ADLs ("activities of daily living")." Plaintiff also said he was hard to handle.

The ALJ also noted inconsistencies in Plaintiff's statements. SSR 96-7p provides, in

pertinent part:

> One strong indication of the credibility of an individual's statements is their
> consistency, both internally and with other information in the case record. The
> adjudicator must consider such factors as:
>> The degree to which the individual's statements are consistent with the
>> medical signs and laboratory findings and other information provided by

medical sources, including information about medical history and treatment.

The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

As noted above, in August 2002, Plaintiff reported that she spent a great deal of time caring for her disabled son, "as he require[d] a fair amount of supervision in the home and help with such things as shopping, housecleaning and ADLs (activities of daily living)." Yet in February 2002, she stated the son provided assistance to her, helping her mop, sweep, shop, take out the trash, and assist her when traveling by providing directions and reading road signs.

Plaintiff's statements regarding her use of alcohol have also been inconsistent, as the ALJ noted. In November 2001, Plaintiff stated she had been abstinent since 1981. In March 2002, she

stated that she drank three or four times weekly "until drunk." She told Dr. Osborne she drank vodka daily. She told Dr. Sabio she drank beer and vodka two or three times weekly. She told Dr. Carson she drank alcohol two times a week. She told Ms. Stout she mixed alcohol and her medication for about "two weeks" after her son's death. In August 2002, she denied a history of substance abuse, but admitted she used alcohol to feel better "for a time" after her son's death. These statements were all made within the space of one year. As the ALJ also noted, Plaintiff's use of alcohol and statements concerning use of alcohol are significant because she was expressly warned by her physicians not to mix alcohol and her medications.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's credibility finding.

### D. Mr. Hagerty's MRFC

Plaintiff next argues the ALJ disregarded the MRFC of William Hagerty and the DDS examiner in favor of the PRT of Dr. Urick. Defendant contends the ALJ did not err in her consideration of psychologist Hagerty's report. The ALJ did not give significant weight to Mr. Hagerty's RFC, finding his opinion was contrary to the evidence of record, including the opinions of Ms. Jacobs, Dr. Osborne, and Dr. Urick, and also contrary to his own narrative report.

The undersigned first notes that Mr. Hagerty was not a treating psychologist. He saw Plaintiff on December 2002, for an evaluation. He then completed his RFC in February 2003, opining Plaintiff would have marked limitations in several areas of functioning. Where asked to explain his limitations, Mr. Hagerty cited to a "symptom assessment completed on 1/22/03." He also referred to this assessment as a "symptom checklist." In other words, Mr. Hagerty based his opinion that Plaintiff would be markedly limited on Plaintiff's reported symptoms. As the undersigned has

already found substantial evidence supports the ALJ's finding that Plaintiff's allegations regarding her symptoms were not entirely credible, it follows that opinions based on those allegations may be accorded less weight than those based on other evidence.

Plaintiff states that Dr. Urick had only one contact with her before writing the PRT upon which the ALJ relied. (Plaintiff's brief at 6). This assertion is incorrect, however. Dr. Urick first saw Plaintiff in August 2002. At the time Plaintiff informed her she used to take Prozac and it helped, but she had not taken it for several months due to an inability to afford it. Dr. Urick specifically noted that Plaintiff had had a good response to Prozac in the past, and re-started it.

Only a month later, Plaintiff told her treating physician her depression was better since she had seen Dr. Urick and began taking Prozac.

On her Request for Hearing, Plaintiff stated she saw Dr. Urick 2x per month (R. 119).

At the administrative hearing Plaintiff testified Dr. Urick was her treating psychologist. The record therefore clearly shows that Dr. Urick is Plaintiff's treating psychologist. In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

The ALJ therefore properly accorded more weight to Dr. Urick's opinion than that of Mr. Hagerty and the DDS examining psychologist. Significantly, Dr. Urick's and Mr. Hagerty's opinions were both submitted within days of one another. Dr. Ulrick opined that Plaintiff had major depressive disorder but it was not severe. It was currently mild (R. 368). Her depressed mood, psychomotor agitation, and decreased energy were also mild and occurred only on an occasional basis. Dr. Ulrick

opined Plaintiff would have no restriction of activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and had had one or two repeated episodes of decompensation, each of extended duration (R. 375).

Plaintiff also notes that treating physician Osborne noted Plaintiff's mental decompensation during office visits and in her own physical RFC. Dr. Osborne, however, simply stated that mental impairments would contribute to Plaintiff's inability to work, and a "mental evaluation should be reviewed." The ALJ did review the mental evaluations, completed by Mr. Hagerty and Dr. Urick only two months earlier.

The undersigned therefore finds the ALJ did not err by rejecting the RFC of examining psychologists Mr. Hagerty and the DDS psychologist in favor of the PRT of treating psychologist Urick.

### E. Hypothetical to the VE

Plaintiff next argues the ALJ relied upon an incomplete and inadequate hypothetical question posed to the VE and by limiting counsel's representation of her client, destroyed the non-adversarial nature of the proceeding. Coffman vs. Bowen, 829 F.2d 514 (4th Cir. 1987). At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant

can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993).

Plaintiff's own treating psychologist opined Plaintiff's mental impairments were not severe. Her depressed mood, psychomotor agitation, and decreased energy were mild and occurred only occasionally. Further, she would have no restriction of activities of daily living, no difficulties in maintaining social functioning, and only mild difficulties in maintaining concentration, persistence or pace.

Plaintiff's treating physician opined Plaintiff would be capable of performing work at the light exertional level for an eight-hour day. She would not need to alternate position frequently or even occasionally. She would not need a sit/stand option. She could sit for six hours at a time, stand for one hour at a time, and walk for one hour at a time. She would not need to lie down or recline during the day with her feet up or have frequent rest periods. She could bend and stoop infrequently, and perform other posturals occasionally. She should avoid concentrated exposure to hazards. She could use her hands for repetitive actions.

The ALJ asked the VE a hypothetical that contained all the treating psychologist's and doctor's limitations, plus several additional limitations. She limited her to light work with only

occasional non-repetitive posturals, a sit-stand option, low stress, routine and repetitive unskilled work with no concentrated exposure to hazards (R. 455). The VE testified there would be a significant number of jobs in the national economy the hypothetical individual could perform.

Plaintiff argues that, when asked to assume elements of Mr. Hagerty's mental RFC, the VE testified there would be no jobs available. As already discussed, however, the ALJ properly rejected Mr. Hagerty's RFC. The undersigned therefore need not discuss the issue of the ALJ's limitation of counsel's questions regarding that MRFC.

The undersigned finds the ALJ's hypothetical to the VE reflected all the limitations supported by the record. The undersigned therefore finds substantial evidence supports the ALJ's hypothetical to the VE.

### F. Closed Period of Disability

Plaintiff next argues the ALJ failed to consider a closed period from January 2002, when Plaintiff filed her application, through February of 2003. There is little doubt that Plaintiff's mental impairments were very limiting in November 2001. As the ALJ stated, it is understandable that Plaintiff had a very difficult time dealing with the death of her son and the abandonment by her husband within a six month period. By March 2002, however, she was feeling better, sleeping better, and her mood was better. In August, Plaintiff told Dr. Urick Prozac had been helpful, but she had stopped taking it months earlier because she could not afford it. Dr. Urick assessed her GAF at 50 at the time, just on the borderline between severe symptoms (41-50) and moderate symptoms (51-60). She opined Plaintiff's prognosis was good. Dr. Urick re-started Plaintiff on Prozac and within one month Plaintiff reported her depression was better. By February 2003, a little more than a year after she applied for benefits, and only six months after starting psychiatric treatment and medication, Dr. Urick opined Plaintiff had no severe mental impairment at all. Her depression was mild, her depressed mood, psychomotor agitation, and decreased energy were mild and occurred only

33

occasionally. She opined Plaintiff would have no restriction of activities of daily living, no difficulties in maintaining social functioning, and only mild difficulties in maintaining concentration, persistence or pace. A month after that, Dr. Osborne described Plaintiff as "happy."

The undersigned finds the above evidence does not support a finding that Plaintiff was disabled from November 2001 through February 2003, as she argues. The ALJ therefore did not err by failing to find a closed period of disability.

### G. Motion for Remand for New Evidence Submitted to the Court.

Plaintiff also filed a Motion for Remand for New and Material Evidence, moving the Court for a remand of her claim back to the Commissioner for consideration of new evidence. The new evidence consists of an MRI of the lumbar spine dated January 21, 2005, showing disc herniation at L1-L2 and L5-S1; neural foraminal encroachment at L4-5 and L5-S1; prominent disc disease throughout; and a prominent bony hyperostosis at L5-S1.

In Borders v. Heckler, 777 F.2d 954 (4th Cir.1985), the United States Court of Appeals for the Fourth Circuit summarized the standards under which a motion for remand must be considered as follows:

> A reviewing court *may* remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir.1983). It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. *King v. Califano*, 599 F.2d, 597, 599 (4th Cir.1979); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir.1980). There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, 42 U.S.C. § 405(g), and the claimant must present to the remanding court "at least a general showing of the nature" of the new evidence. *King*, 599 F.2d at 599.

777 F.2d at 955 (Emphasis added).

The undersigned first notes the court is *may* remand, not *must* remand a case. The undersigned finds the evidence is new in that it is not merely cumulative. Plaintiff has also shown

good cause for her failure to submit the evidence to the Commissioner, as the evidence did not exist until 20 months after the ALJ's decision. Further, Plaintiff presented to the court more than "a general showing of the nature" of the evidence.

The undersigned does not find Plaintiff met her burden of showing the evidence is relevant to the determination of disability at the time the application was first filed, however. The ALJ's decision in this matter was entered in May 2003. The MRI was therefore obtained one year and eight months after the decision. Further, Plaintiff's treating physician for four years stated Plaintiff's past relevant medical history as a history of chronic complaints of back pain with intermittent flares during the relevant time period. Plaintiff described her back pain to Ms. Blake in 2002, as "intermittent" low back pain with radiculopathy into the left leg. She was able to walk on her heels, toes, and in tandem, stand on either leg separately, and squat fully. Her gait was normal. She complained in August 2002, that her back hurt "if she mopped too much." Plaintiff was actually working at the time, although at a job with accommodations. She mopped, vacuumed, and washed walls, among other physical chores (R. 381). She reported spending a great deal of time caring for her disabled son, helping with shopping, housecleaning, and his activities of daily living. In November 2002, she told her treating physician she that medically she was doing well with no complaints.

For all the above reasons, the undersigned finds the new evidence is not material to the relevant time period, and recommends Plaintiff's Motion for Remand be **DENIED**.

## VI. Recommendation

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's application for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [D.E. 13] be **GRANTED**, Plaintiff's Motion for Summary Judgment [D.E.

9] be **DENIED**, Plaintiff's Motion for Remand [D.E. 10] be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _/0_ day of February, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE